IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


UNITED STATES OF AMERICA                          PLAINTIFF(S)

V.                               CIVIL ACTION NO. 5:11cv117-DCB-RHW

MARKUS BRENT STANLEY                              DEFENDANT(S)

<u>MEMORANDUM OPINION AND ORDER</u>

On August 11, 2011, the United States of America filed the
instant suit against Dr. Markus Brent Stanley to reduce to judgment
his outstanding federal income tax liabilities for tax years 1998-
2010. In order to obtain this relief, it asked this court to find
that Dr. Stanley's 1998-2008 tax liabilities were excepted from his
bankruptcy discharge granted pursuant to 11 U.S.C. § 727 in <u>In Re
Markus Brent Stanley</u>, No. 09-01727 (Bankr. S.D. Miss.). After more
than a year of discovery, the United States filed a motion for
summary judgment, claiming that there was no disputed issue of
material fact as to whether Dr. Stanley's 1998-2010 tax liabilities
should be reduced to judgment. The court granted summary judgment
in part and denied it in part. As to Dr. Stanley's 2009 and 2010
tax liabilities, which represent the tax liabilities assessed after
bankruptcy, the court determined that they should be reduced to
judgment because Dr. Stanley had not contested them. As to Dr.
Stanley's 2005-2008 tax liabilities, which represent the
liabilities for which his tax returns were due to be filed less
than three years before his bankruptcy petition date of May 18,

2009, the court determined that they should be reduced to judgment because they were not excepted from discharge pursuant to 11 U.S.C. §§ 507(a)(8)(A)(I) and 523(a)(1)(A).[1] But as to Dr. Stanley's 1998-2004 tax liabilities, which represent the balance of his unpaid taxes, the court determined that there was a genuine dispute of material fact as to whether Dr. Stanley's tax liabilities for those years were discharged pursuant to 11 U.S.C. § 523(a)(1)(C).[2]

Following this decision, Dr. Stanley filed a litany of motions for relief, each of which was subsequently denied. The relief sought in those motions need not be recounted here, but one of Dr. Stanley's post-summary-judgment refrains is noteworthy. Starting first in his motion for reconsideration and continuing up until the last day of trial, Dr. Stanley asserted, at times enthusiastically, that the bankruptcy court had ruled that his 1998-2004 tax liabilities were discharged pursuant to 11 U.S.C. § 523(a)(1)(C), and that to have this issue determined by this court is essentially

---

[1] In a June 18, 2013 Opinion and Order, the court noted that its April 25, 2013 Opinion and Order was unclear as to whether Dr. Stanley's 2005 tax liability was discharged pursuant to 11 U.S.C. §§ 507(a)(8)(A)(I) and 523(a)(1)(A) and clarified that it had not been discharged. See June 18, 2013 Order at 1 n.1, docket no. 75.

[2] For further clarification, the 2005-2008 tax liabilities are included in the court's 11 U.S.C. § 523(a)(1)(C) analysis even though the court has already determined that those tax liabilities are nondischargeable pursuant to 11 U.S.C. §§ 507(a)(8)(A)(I) and 523(a)(1)(A). Throughout this litigation, the court has focused on the 1998-2004 tax liabilities because those are the only tax liabilities that the parities agree could be discharged in bankruptcy.

an untimely appeal of that decision. Dr. Stanley went so far as to suggest that this court had undertaken the same analysis as the bankruptcy judge but reached the opposite conclusion. Concerned by this allegation, the court carefully considered it but found that (1) Dr. Stanley waived this argument by not raising it by motion before the summary-judgment disposition and, in the alternative, (2) Dr. Stanley had not produced any evidence to support his suggestion that the bankruptcy court had considered the issue, much less decided it. See July 10, 2013, Opinion and Order. Finding neither this nor any other of the arguments raised by Dr. Stanley to be meritorious, the court determined to proceed with the scheduled trial.

Therefore, this case came on for trial before the court without a jury on July 23, 2013. Each side was represented by exceedingly well prepared counsel. Because of the long period of time involved in this tax case, together with the need to present a complete record of the issues involved, the plaintiff offered 197 exhibits which were received into evidence. The core undecided issues are, first, whether the 1998-2004 tax liabilities of debtor, Dr. Marcus Brent Stanley, were discharged in bankruptcy, which involves an inquiry as to whether Dr. Stanley attempted to evade or defeat income tax liability and, if so, whether he did so

willfully.[3] The court finds that these liabilities were not discharged and that there was a knowing, deliberate, and willful violation of the taxpayer's duty to pay.

## JURISDICTION

As a preliminary matter, the instant suit for a judgment reducing Dr. Stanley's tax liabilities is proper in this court. The court has "original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue . . . ." 28 U.S.C. § 1340. Similarly, the court has "original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress . . . ." 26 U.S.C. § 1345. Finally, the court has jurisdiction "to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402(a).

---

[3] The pretrial order listed three contested issues of fact and six contested issues of law. See Pretrial Order at 5. Of the three contested issues of fact, however, the first pertained to the dischargeablity of Dr. Stanley's 2005 tax liability, which had been previously clarified. See supra note 1. The other issue of fact, whether Dr. Stanley's bipolar disorder rendered him "non compos mentis," is only relevant insofar as it pertains to the court's 11 U.S.C. § 523(a)(1)(C) analysis and therefore is best considered a subcategory of that issue. In other words, that Dr. Stanley was "non compos mentis" does not appear to be a legal justification for preventing the United States from reducing his 2005-2010 tax liabilities to judgment because the nondischargeability of those debts has nothing to do with his mental state. As for the six issues of law, each relates to the one contested issue of fact at trial, with the exception of the fifth, which relates to Dr. Stanley's res judicata argument.

But as to whether this court has jurisdiction to apply 11 U.S.C. § 523(a)(1)(C), a word of clarification is in order. As referenced above, Dr. Stanley continues to maintain that this court cannot render a decision regarding his 1998-2004 tax liabilities because the present suit, at least insofar as it pertains to these liabilities, is an untimely appeal of the bankruptcy court's determination that those tax liabilities were discharged. To the extent that Dr. Stanley maintained or continues to maintain that Chief Judge Ellington affirmatively made such a finding and therefore this court is barred by the doctrine of res judicata, that objection was waived because Dr. Stanley waited until fewer than thirty days before the scheduled trial to call it to the court's attention by motion for reconsideration. See L.U.Civ.R. 7(b)(2)(A); Brown v. Illinois Cent. R. Co., Inc., 480 F. App'x 753, 754 (5th Cir. 2010); see also Lafreniere Park Found. v. Broussard, 221 F.3d 804, 808 (5th Cir. 2000) (stating that a res judicata defense should be asserted at a "pragmatically sufficient time"). Alternatively, and more importantly, this court evaluated the evidence in the record at the time this objection was raised and found that it did not support the conclusion that the United States should be estopped from pursuing a collection of his 1998-2004 tax liabilities. No new evidence or argument presented at trial altered the court's conclusion on this issue.

Latent in Dr. Stanley's objection is an undercurrent of

concern as to whether a suit regarding the dischargeability of his tax liabilities can be or should be determined by a court other than the bankruptcy court. This court touched on this issue by reference to United States v. Coney, 689 F.3d 365 (5th Cir. 2012), which unfolded procedurally in the same manner as the present case. Although the Fifth Circuit was not asked to address explicitly the basis for the district court's jurisdiction over a § 523(a)(1)(C) suit, the district court's jurisdiction was certainly implied from the Fifth Circuit's decision to affirm on the merits. See also, United States v. Storey, 640 F.3d 739 (6th Cir. 2011) (unfolding, procedurally, like Coney). Further, this court also referenced the Fifth Circuit's unpublished opinion In re Range, 48 F. App'x 103 (5th Cir. Aug. 20, 2002), which, again, did not squarely address jurisdiction but clearly held that the United States as creditor was not required to take any action in the debtor's bankruptcy proceedings to prevent the debtor's tax liabilities from being automatically discharged under § 523(a)(1)(C), indicating that a § 523(a)(1)(C) analysis could be undertaken at a later date and, presumably, in another court with jurisdiction. These cases taken together indicate that this court has concurrent jurisdiction with the bankruptcy court to determine whether Dr. Stanley's taxes were excepted from discharge under 11 U.S.C. § 523(a)(1)(C).

In addition to this case law, the Ninth Circuit has directly stated that a district court has jurisdiction concurrent with the

bankruptcy court to determine the dischargeability of tax liabilities pursuant to 11 U.S.C. § 523(a)(1)(C). In re Eber, 687 F.3d 1123, 1128 (9th Cir. 2012). It explained that there are two major categories of discharge exceptions:

> [D]ebts over which the bankruptcy court has exclusive jurisdiction to determine dischargeability, and those that it does not. See 11 U.S.C. § 523(c). Bankruptcy courts have exclusive jurisdiction to determine dischargeability of debts under § 523(a)(2) (fraud or deception); (a)(4) (fiduciary fraud, embezzlement, or larceny); and (a)(6) (willful and malicious injury to person or property). With respect to all other subsections of § 523(a), bankruptcy courts have concurrent rather than exclusive jurisdiction to determine whether a debt is excepted from discharge.

Id. (internal citations and parenthetical explanations omitted). This explanation reflects the same understanding of § 523 set forth by the Fifth Circuit in In re Range. See Range, 48 F. App'x 103, at *5 n.2. In sum, this court reiterates that Dr. Stanley's tax liabilities for the years 1998-2004 were not discharged in bankruptcy and conclusivley finds that it does have jurisdiction to determine whether these tax liabilities were excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).

## FINDINGS OF FACT

At the close of trial, Dr. Stanley contended that his 1998-2004 tax liabilities were discharged in bankruptcy because the United States could not and did not prove by a preponderance of the evidence that his conduct with regard to his taxes was willful. With the exception of his attempt to blame his accountant for his

decade long evasion of taxes, Stanley's trial defense focused exclusively on the fact that he suffered from type II bipolar disorder during the relevant tax years. The argument presented was that the effects of his bipolar disorder rendered him unable to willfully evade or defeat his taxes. Pursuant to Federal Rule of Civil Procedure 52, the court hereby makes findings of fact as it relates to the failure to pay his taxes for the years 1998-2004, focusing particularly on the effects of his bipolar disorder.[4]

This case represents a staggering amount of documentation which evinces an enormous effort on behalf of the plaintiff in preparation not only for this case but for the accounting difficulties encountered in dealing with an uncooperative taxpayer. The documentation, which totals more than 2000 pages chronologically arranged in four trial binders, tells the story of how, starting in 1998, and even before that date, Dr. Stanley delayed reporting his taxable income and failed to pay his taxes. The documentation also records the efforts to which the IRS went to ensure that his tax liabilities were accurately reported and the considerable time it devoted in attempting to collect payment of those liabilities. Indeed, the trial exhibits, compositely, are a testament to the enormous amount of time and effort expended by the

---

[4] The court notes that because the dispute is over Dr. Stanley's intent, it is at times difficult to distinguish between a factual and legal conclusion. These factual findings are primarily devoted to determining, factually, whether Dr. Stanley could have paid his 1998-2004 federal income taxes.

plaintiff and its agents as they have attempted to recover Dr. Stanley's taxes.

Nevertheless, to date, Dr. Stanley has failed to pay over $1,316,354.66 he owes in federal taxes, penalties, and interest. In the interest of expediency, the court will not recount the dates on which Dr. Stanley filed his tax returns and the amount of his unpaid liabilities for each tax year. This information is reflected in plaintiff's exhibits US-72 (representing dates the tax returns were filed) and US-71 (representing the assessed amounts, unpaid liabilities), which were admitted into evidence without objection and were consistently referenced during the four-day trial. This evidence shows, and the court hereby finds, that Dr. Stanley filed his tax returns late for the years 1998, 1999, 2000, 2003, 2005, 2006, 2007, 2008, 2009, reported the wrong taxable income amount for the years 1998, 1999, 2000, 2001, 2003, and has not paid his tax liabilities in full for any of the eleven consecutive tax years from 1998 through 2008 in spite of the IRS's considerable efforts to collect them. The court also notes that Dr. Stanley's 1998 tax return was filed in 2004, only after the IRS had begun its audit of Dr. Stanley's 1998, 1999, and 2000 liabilities.

Turning now to Dr. Stanley's bipolar disorder, we begin with defendant's expert Dr. F. A. Steinberg, a qualified forensic psychologist who testified in detail about bipolar disorders, primarily bipolar II. Based on family history together with a study

of the lifestyle and activities of Dr. Stanley, including interviews and other research tools, Dr. Steinberg reached the conclusion that this taxpayer suffers from a bipolar II disorder manifested in various depressive episodes which can cause the impairment of routine as well as occupational functioning. This expert concluded that there would be intervals when Dr. Stanley, and presumably other patients who suffer this disorder, can function normally as well as periods of irresponsible conduct, including failure to appear at work, the passing of overdraft checks, as well as other irresponsible behavior. This expert, moreover, opined that the failure to pay taxes is consistent with the effects of this mental disorder.[5]

Dr. Stanley is a doctor of osteopathic medicine. He completed his internship in or about 1996 and has subsequently worked in various venues with a substantial part of his practice involving work as an emergency room physician and family practitioner in various hospitals. He testified that he was aware of his duty to file returns as well as aware of his duty to pay his taxes, but in support of the expert's diagnosis of mood swings and periods of inertia, the defendant testified that during his family medicine

---

[5] At trial, the court allowed Dr. Steinberg to opine about how Dr. Stanley's bipolar disorder affected his ability to pay his taxes but held in abeyance the plaintiff's objection to Dr. Steinberg's expert report being admitted into evidence. The court will admit the report into evidence but notes that it is the testimony, not the report, which is most relevant to Dr. Stanley's defense.

practice at an establishment in Port Gibson, Mississippi, he abandoned the normal and required procedure of placing a narrative into the charts of various patients, and in lieu thereof, placed small yellow, pre-glued reminders on numerous charts, filing them in a cabinet. He was admonished by his supervisor, Dr. Pierce. While his inattention to detail appears consistent with his diagnosis, the court notes that he had the capacity over a period of two weeks to review the charts which covered approximately two years and to place in each the proper treatment analysis and diagnosis. In 2004, he was involved in a contested divorce with his wife Dana, and according to his lawyer Travis Vance, Dr. Stanley entered into a property settlement agreement against the advice of his counsel. The strain of the divorce from Dana, described by Mr. Vance as, "the meanest woman I have ever known" was offered by Dr. Steinberg as a contributing factor to the onset of the disease.

In 2004, the defendant married his current wife Connie Denise Stanley. The marital domicile occupied by Dr. Stanley and Dana Stanley was subject to a mortgage which fell into default and which, in 2005, was the subject of a foreclosure sale. The plaintiff makes much of the fact that this house and lot on King Arthurs Ridge in Vicksburg, Mississippi was purchased by Dr. Stanley's current wife Denise with title vesting in her name. Consideration for the purchase was provided by a local bank with Dr. Stanley as guarantor on the $195,587.50 note. It is the

contention of the plaintiff that by placing the property in the name of Mrs. Stanley, the taxpayer could avoid a levy. There may be merit in this contention, but the court does not find that the primary reason for the absence of Dr. Stanley's name on the deed was to avoid seizure. Mrs. Stanley testified that the reason for the title arrangement was to avoid the consequences of an ongoing malpractice lawsuit against her husband. What is noteworthy, however, is the fact that the defendant was able to participate in this transaction together with his involvement in a second mortgage in 2006 which provided $50,000 that was utilized to shore up the foundation of the house and for other repairs as well. This mortgage was also guaranteed by the defendant who, together with his wife, has managed to make timely payments on these two mortgages through the years and maintain ownership of his residence. Regardless of whether this home ownership and mortgage arrangement had something to do with this federal tax liabilities, the Court finds that Dr. Stanley exhibited the capacity to participate in these rather complex property transactions. The court also finds that he had the ability to structure his mortgage in such a way as to avoid the possibility of judgment liens which could have resulted from damage suits against him.

The court finds that in addition to the disorderly keeping of medical records which brought on the admonishment of Dr. Pierce, his supervisor, the defendant, from the year 1998 forward, ignored

12

essentially all of the tax obligations and deadlines required by law. The defendant testified that he put his mail, unopened, in a box, thus turning a blind eye to these obligations yet simultaneously and timely servicing other debts. Belatedly filing his 1998 income tax return in 2004, he had prior thereto bought an Indian Chief motorcycle, and during the same time frame, a 2003 Jaguar automobile which was traded two years later for a newer model.[6] Moreover, during this long period of nonpayment he was able to make approximately eight trips outside of the country, primarily to Mexico, at a minimum cost of $3,000 each. He was able to purchase a Jeep Wrangler for approximately $35,000, as well as an Infiniti for roughly the same amount. The Jaguars were financed and the defendant has been able to make timely payments and avoid repossession. In 2004 he purchased a ring for his wife in the amount of $16,000, together with an expensive necklace.[7] The court finds these purchases demonstrate not only that Dr. Stanley was capable of making financial choices but also capable of supporting

---

[6] His petition for bankruptcy was filed on the 18th day of May, 2009, and in the proceeding he reaffirmed his obligation to pay for the Indian motorcycle and his automobiles.

[7] During much of the time period involved, the defendant's record keeping was abysmal. There were some 999 plus overdraft obligations resulting in fees charged to Dr. Stanley totaling over $25,000. Moreover, he failed his medical board exams on a number of occasions, and he suffered some degree of suicidal ideation. In or about 2007, he sought medical treatment, spent time at Pine Grove Recovery Center of Forest General Hospital in Hattiesburg in a psychiatric unit, underwent therapy, and presently takes lithium twice a day in treatment of the bipolar disorder.

those choices by making the necessary payments.

In or about 2005, he established a corporation under the name of Vicksburg Primary Care Team, Inc., a requirement, he testified, precedent to employment with Mission Primary Care Clinic, PLLC, at Vicksburg. He made numerous cash withdrawals from Vicksburg Primary Care Team, Inc., and made intermittent payments to his wife, with regard to which Denise Stanley testified that she did no work for Vicksburg Primary Care Team, Inc., and was not otherwise entitled to receive the payments from this corporation that was wholly-owned by Dr. Stanley. Following negotiations with the IRS, Dr. Stanley entered into an Installment Agreement regarding his 1998, 1999, 2000, 2001, 2002, and 2003 income tax liabilities, under which he agreed to pay $100 per month for April through July of 2005, increasing to $5,000 for August of 2005, and $5,000 per month thereafter. Although he was able to take the out-of-country vacation trips mentioned above, and to meet all of the obligations set forth, Dr. Stanley ignored his obligations under the Installment Agreement set forth in detail in a letter to him of July 8, 2005, from the IRS, save the payment of $100 in April of 2005 and $5,000 in August of 2005.[8] The court finds that the

---

[8] Around the same time that Dr. Stanley was representing to the IRS agent that he would not have sufficient income to initially pay more than $100 per month for the four months from April of 2005 through July of 2005 under the Installment Agreement due to his job change, he took a vacation to Cancun, Mexico, at the cost of over $3,000 in March of 2005.

plaintiff through its agents, particularly Agent McCullough, worked with the taxpayer over a period of years in an effort to establish a reasonable Installment Agreement. However, once the Installment Agreement was in place, the defendant continued his evasive and fugitive behavior, willfully neglecting his obligation. The court further finds that his breach of this agreement, particularly his failure to withhold employee taxes from Vicksburg Primary Care while at the same time making non-business related payments to his wife and withdrawing thousands of dollars in cash from its operating account, exhibits an active attempt to avoid paying federal income taxes.

Finally, the plaintiff devoted substantial time at trial to show that Dr. Stanley's monthly income reported in his bankruptcy schedules was false. Indeed, it is difficult to reconcile a gross monthly income of $5,760.00, the gross monthly income reported on his bankruptcy schedule, with his yearly income of $329,000, an amount that Dr. Stanley admitted to making in 2009. Because all other evidence indicates that Dr. Stanley's tax evasion was willful, the court need not find whether the seemingly discrepant amounts are attributable to a sizable dip in Dr. Stanley's yearly income for the month reported in his bankruptcy schedules, or whether it is due to some other intentional or unintentional misrepresentation on Dr. Stanley's part (or due to some unaccounted-for mistake).

15

### CONCLUSIONS OF LAW

**Conduct Requirement**

As noted in the court's April 25, 2013 Order, <u>United States v.</u> <u>Coney</u>, 689 F.3d 365, 371 (5th Cir. 2012), is the Fifth Circuit's most recent published opinion on the interpretation and operation of 11 U.S.C. § 523(a)(1)(C). In that opinion, the Fifth Circuit stated that § 523(a)(1)(C) contains a conduct requirement and a mental state requirement. To satisfy the conduct requirement, the United States must show by a preponderance of the evidence that the debtor "attempted in any manner to evade or defeat [a] tax." <u>Id.</u> Elaborating on the phrase "in any manner," the Fifth Circuit explained that the debtor can attempt to evade or defeat a tax by either avoiding its assessment or thwarting its collection. <u>Id.</u> at 372-73. This distinction can be relevant, as it was in <u>Coney</u>, when a debtor timely files accurate tax returns but fails to pay his liabilities once they have been assessed. <u>Id.</u> at 375-76. Here, this distinction is irrelevant because Dr. Stanley failed to file his tax returns in a timely manner and, by the time he filed for bankruptcy, he successfully avoided collection of the substantial liabilities and penalties assessed by the IRS.

Because the evidence shows Dr. Stanley filed his tax returns late for the years 1998, 1999, 2000, 2003, 2005, 2006, 2007, 2008, 2009, reported the wrong taxable income amount for the years 1998, 1999, 2000, 2001, 2003, and has not paid his tax liabilities in

16

full for any of the eleven consecutive tax years from 1998 through 2008 in spite of the IRS's considerable efforts to collect them, Dr. Stanley's behavior satisfies the conduct requirement of § 523(a)(1)(C). See In re Fretz, 244 F.3d 1323 (11th Cir. 2001) ("[O]mitting to file tax returns, when coupled with the failure to pay taxes, does satisfy the conduct requirement of § 523(a)(1)(C).") (citing In re Fegeley, 118 F.3d 979, 984 (3d Cir. 1997)); In re Toti, 24 F.3d 806, 809 (6th Cir. 1994)); see also Coney, 689 F.3d at 371 (drawing from Fretz and Fegeley to conclude that the "willfully attempted" exception contains a conduct requirement). Therefore, the court will focus its analysis on the mental state requirement of § 523(a)(1)(C), paying particular attention to the effects of Dr. Stanley's bipolar disorder.[9]

**Mental State Requirement**

To evaluate whether a debtor had the requisite mental state for his debts to be excepted from bankruptcy discharge, the Fifth

---

[9] The court has stated in two previous orders that it is difficult precisely to distinguish the conduct requirement from the mental state requirement if the conduct requirement is viewed to incorporate the word "attempted" into its inquiry. The point of highlighting this inherent overlap is to avoid a rigid application of the evidence. Indeed, the majority, if not all, of the evidence cited as probative of the issue of willfulness is also directly linked to whether Dr. Stanley *tried to* evade or defeat his taxes. Viewed in that light, the subsequent analysis of Dr. Stanley's mental state underscores the court's conclusion that his behavior satisfies the conduct requirement of § 523(a)(1)(C). No matter how the court considers the evidence, a preponderance of it establishes that Dr. Stanley "willfully attempted in any matter to evade or defeat" his taxes.

Circuit uses a three-part test. Id. at 376. (citing In re Bruner, 55 F.3d 195 (5th Cir. 1995)). That test is whether the debtor "(1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty." Coney, 689 F.3d at 376 (citing Bruner, 55 F.3d at 197; Fretz, 244 F.3d at 1330). Because most debtors concede the first two prongs, e.g., In re Mitchell, 633 F.3d 1319, 1327 (11th Cir. 2011), as Dr. Stanley has done in his summary judgment briefing and during the bench trial, an understanding of the third prong is critical to any § 523(a)(1)(C) inquiry.

There is considerable guidance on what it means to "voluntarily and intentionally violate[]" one's duty to pay taxes. Starting with the Fifth Circuit's instruction, the inquiry under the third prong *is not* whether the debtor had a specific intent to defraud the United States. Coney, 689 F.3d at 376. Instead, the inquiry is whether the debtor "voluntarily and intentionally commit[ed] or attempt[ed] to commit an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection, or payment of a tax." Id. (alteration in original). Although the Fifth Circuit declined to expand on what would constitute a "culpable omission", id. at 373 n.3, the Sixth Circuit has suggested that a taxpayer can run afoul of the willfulness requirement simply by knowing about his duty to pay taxes but deliberately choosing not

18

to fulfill that duty. See Storey, 640 F.3d at 744.

To elaborate, a taxpayer's failure to timely report his taxable income to the IRS in any given year, without more, is not evidence of a culpable omission. See In re Birkenstock, 87 F.3d 947, 951 (7th Cir. 1996) (stating that this evidence simply indicates that the debtor, like all other debtors, did not meet his obligations). But evidence indicating that this same taxpayer *knew about* his duty to file his tax returns but did not fulfill that duty, particularly absent a credible alternative explanation, certainly suggests a culpable omission. See Storey, 640 F.3d at 744 (6th Cir. 2011) (stating that a knowing nonpayment of taxes "provides the basis" for nondischargeability). Likewise, a debtor who timely files his tax returns (thereby demonstrating a knowledge of his reported liabilities) but makes no effort to pay his taxes when he has the ability to pay them indicates some degree of culpability. Coney, 689 F.3d at 378 n.4 (citing In re Grothues, 226 F.3d 334, 339 (5th Cir. 2000)); see also, Birkenstock, 87 F.3d at 953 (noting that a bankrupt who is unable to pay his debts could also have his tax liabilities excepted from discharge).

Two other lines of persuasive authority are helpful to understanding the mental state requirement. First, the Eleventh Circuit, a circuit that has confronted more than its fair share of § 523(a)(1)(C) disputes, has illustrated what constitutes an intentional and willful evasion by contrasting it with an

19

inadvertent error or a mistake. In re Jacobs, 490 F.3d 913, 923-34 (11th Cir. 2007) (explaining, however, that contrasting an "inadvertent mistake" with a voluntary or intentional act does not alter the overall standard of evaluation); see also Coney, 689 F.3d at 374 (quoting Birkenstock, 87 F.3d at 952). While this illustration is not entirely apposite to the case at bar because Dr. Stanley has not argued inadvertence or mistake, it provides at least one picture of how the § 523(a)(1)(C) exception is more than a mere "empty letter." See Bruner, 55 F.3d at 200 (rejecting but quoting In re Haas, 48 F.3d 1153, 1156 (11th Cir. 1995), overruled in part by In re Griffith, 206 F.3d 1389 (11th Cir. 2000)). That liability either incurred or left unpaid through taxpayer error would be dischargeable in bankruptcy is consistent with the bankruptcy code's offer of a "fresh start" only to "honest but unfortunate" debtors. See Coney, 689 F.3d at 371.

Second, a number of courts, either explicitly or implicitly as a part of their totality-of-the-circumstances analysis, have looked to the debtor's other financial activity during the years in question when reaching a determination as to the debtor's intent with regard to his tax liabilities. E.g., In re Bryen, 449 F. App'x 165, 168 (3rd Cir. 2011); In re Zimmerman, 262 F. App'x 943, 947 (11th Cir. 2008); In re Gardner, 360 F.3d 551, 560-61 (6th Cir. 2004). Instances of lavish living have been consistently cited as probative of the debtor's mental state and are universally

interpreted—at least as far as the court's survey of the case law has revealed—to be unfavorable to the debtor's claim that he is simply an honest and unfortunate debtor seeking a fresh start. E.g., Storey, 640 F.3d at 745; United States v. Clayton, 468 B.R. 763, 772 (M.D.N.C. 2012); In re Mixon, 2008 WL 2065895, at * 6 (Bkrtcy. N.D. Tex. May 13, 2008); In re Peterson, 317 B.R. 556, 564 (Bankr. N.D. Ga. 2004). Each debtor's mental state should be evaluated on an individual basis, which in this case requires the court to account for Dr. Stanley's bipolar disorder, but considering what a debtor could and did pay for during the years in which he ignored his federal tax obligations—particularly when the debtor is aware of his obligations—is material to the court's evaluation as to whether the debtor's tax evasion was willful.

Unquestionably, this taxpayer has exhibited symptoms consistent with the diagnosis of Dr. Steinberg and apparently, under medication, he is now more observant of his obligations. In explanation of his extended habit of nonpayment, he testified that he did not understand taxes and that he relied upon his accountants.[10] These sporadic periods of ineptness and/or neglect

---

[10] There is some suggestion by the defendant that his woes are attributable to the oversight of his accountants. In response to questions by the court, answers were provided which lead to the conclusion that any suggestion of failure on behalf of these representatives has no merit. First, as the United States stressed, Dr. Stanley signed every document and agreement for which he was responsible. Dr. Stanley is an intelligent individual, and while he may not have understood all the terms therein, he did understand the difference between a 1099 and W-2 wage earner. Second, the

may well be attributable, at least in part, to the underlying disease, but the consistent election not to pay taxes over a long period of time when other financial requirements were being met, belies the suggestion that this decision not to pay was anything other than willful. The proposition that he was unable to meet his tax obligations because of a type II bipolar disorder is gainsaid by his ability to service all of his other debts, many of which arose from non-necessities, such as vacations, expensive vehicles, motorcycles, and jewelry, all at a time when tax obligations were outstanding. To say it another way, the court concludes that this defendant purposely subordinated his income tax obligations to pleasurable pursuits in the form of vacations and other amenities. Throughout these extended periods, the IRS afforded this taxpayer due process, together with an opportunity to pay over time under the terms of an installment agreement which was reasonable, considering the income stream earned by Dr. Stanley.

Perhaps even more telling has been his ability to function as a physician in family practice and in the demanding environment of an emergency room, throughout most of the period which is the subject of this suit. Indeed it would be incongruent to find that

---

suggestion that Steve Sessums, his accountant, was responsible for his late or inaccurate tax returns was not proven at trial and is doubtful in any case, since all evidence suggests that the information needed by Sessums in order to accurately prepare his returns could likely be found in the unread mail lying in Dr. Stanley's cardboard discard box.

this taxpayer possessed the ability to provide health care for patients and was yet unable to process the need to pay taxes at a time when he was also able to enjoy a lifestyle outside of his practice which, despite interludes of disruption and abnormality, was in large part rather routine. As would a sophist, the defendant offers seemingly clever but fallacious reasons for the nonpayment of taxes at a time when he had the capacity to practice a demanding profession which involves issues of life and death. It is simply implausible to conclude that he was able to carry on with the most ordinary and routine demands and vicissitudes of life, was able to practice his demanding profession, and yet was unable to meet his tax obligations notwithstanding a very handsome income stream. A decision favorable to the defendant would require the court to find that Dr. Stanley made logical decisions for his personal benefit and gratification and yet suffered impulsive motivations which centered on his election not to pay taxes. Cf. Fretz, 244 F.3d at 1331 ("Put bluntly, someone who can control his drinking enough to perform medical procedures during twelve to twenty-four hour shifts can control his drinking enough to file tax returns and pay taxes during that same period."); In re Hamer, 328 B.R. 825, 835 (Bkrtcy. N.D. Ala. 2005) (concluding from the debtor's spending habits and ability to practice medicine that he could form the intent to evade

his taxes, despite suffering from alcoholism).[11]

Not only is such a conclusion implausible, a decision holding that Stanley's type II bipolar disorder during the years in question rendered him incapable of paying *taxes* would be contrary to the evidence. Lost in the thousands of pages of documents and the four days of testimony is the fact that Stanley did *willfully and intentionally* pay certain taxes during the decade before he filed for bankruptcy. Stanley testified at trial that when the state authorities showed up at his office and threatened to throw him in jail for not paying his state taxes, he immediately took out a loan to satisfy those obligations. Again, in 2007 shortly after Dr. Stanley checked out of Pine Grove rehabilitation facility in Hattiesburg, Stanley personally wrote a $411 check to the Warren County Tax Collector to pay for a licence plate for one of his aforementioned vehicles. Asked by counsel for the United States whether his bipolar disorder affected his ability to pay taxes at that time, Dr. Stanley responded, "I don't think so, apparently I did it."

CONCLUSION

---

[11] Dr. Steinberg's distinguishes the effects of alcoholism and bipolar disorder in order to distinguish this case from <u>Fretz</u>. The court does not doubt Dr. Steinberg's assertion that the conditions of the debtors are distinguishable. The court, however, rejects the conclusion of Dr. Steinberg's expert report insofar as it concludes that the fact that Dr. Stanley has practiced medicine for the last decade cannot be considered pertinent as to whether he had the ability to pay his taxes.

This case exhibits many of the hallmarks of a debtor who willfully attempted to evade or defeat his taxes. To start, Dr. Stanley failed to timely file his tax returns and failed to pay his taxes. For many of the years for which Dr. Stanley chose to file his tax returns, he reported the wrong taxable income amount. Once the IRS discovered Dr. Stanley's failures, he indicated a willingness to cooperate with the IRS, only to default on the installment agreement as soon as the IRS closed its case. Not only did he fail to make more than three or four monthly payments pursuant to his agreement, he failed to withhold employee taxes from his business account while at the same time regularly withdrawing cash from this account for no identifiable purpose. See, e.g., Bruner, 55 F.3d at 198, 200 (noting that unexplained cash transactions can indicate attempts to hide income). The suggestion that his bipolar disorder controlled his ability to willfully evade his taxes is contradicted by the facts that (1) he admitted that he had the mental capacity to avoid other potential liabilities; (2) he participated in other complex financial transactions; (3) he operated as a family physician and emergency room doctor; and (4) he voluntarily paid taxes, including a small portion of his federal income taxes. In sum, the Court finds that the United States has proven by a preponderance of the evidence that Dr. Stanley "willfully attempted in any manner to evade or defeat" his tax liabilities for the years 1998-2004 and therefore

25

those liabilities should be reduced to judgment along with the liabilities for the tax years 2005-2010. <u>See</u> 11 U.S.C. § 523(a)(1)(C).

Having now determined all issues of liability, **IT IS HEREBY ORDERED** that the plaintiff submit a proposed final judgment as to the amount of liabilities, penalties, and interest owed by the Dr. Stanley as of the date on which the final judgment is submitted.

So **ORDERED**, this the 23rd day of August, 2013.


<u>/s/ David Bramlette</u>
**UNITED STATES DISTRICT JUDGE**